KATHLEEN A. McCARTHY,

        Plaintiff,

-v-

AMERITECH PUBLISHING, INC.,
et al.,

        Defendants.

Case No. 3:10-cv-319

Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #70); OVERRULING MCCARTHY'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #67); AND OVERRULING API'S MOTION TO STRIKE AND FOR SANCTIONS (Doc. #88)**

---

This matter arises from the employment and subsequent retirement of Plaintiff Kathleen A. McCarthy ("McCarthy"). McCarthy was employed by Defendant Ameritech Publishing, Inc. ("API"). Defendant AT&T, Inc. ("AT&T") is API's parent company and the administrator of certain pension and/or welfare benefit plans for API of which McCarthy is a participant. The pension and/or welfare benefit plans are governed by the Employee Income Security Act of 1974 ("ERISA").

McCarthy's Second Amended Complaint ("SAC") brings eight (8) claims for relief. Her First Claim for Relief is against API for age discrimination in violation of the Age Discrimination In Employment Act ("ADEA"), 29 U.S.C. § 623(a). Her Second Claim for Relief is against API for gender discrimination in violation of Title VII and Ohio Rev. Code § 4112. Her Third Claim for Relief is an ERISA claim against AT&T for failure to provide documents pursuant to 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1)(B). Her Fourth Claim for Relief is an ERISA claim against AT&T for wrongful denial of benefits. Her Fifth Claim for Relief is against

API for fraudulent inducement. McCarthy's Sixth Claim for Relief is against API for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(a). Her Seventh Claim for Relief is against API for promissory estoppel and her Eighth Claim for Relief is against API for unjust enrichment.

McCarthy has filed a Motion for Partial Summary Judgment (doc. #67) which is now fully briefed and ripe for decision. Defendants API and AT&T have filed a Motion for Summary Judgment (doc. #70) that is also fully briefed and ripe for decision. A relevant factual background will first be set forth followed by the standard of review and an analysis of the pending motions for summary judgment.

## RELEVANT FACTUAL BACKGROUND

Normally, the evidence is viewed in a light most favorable to the non-moving party. Further, the evidence "viewed" by a court when adjudicating a motion for summary judgment includes depositions, documents, electronically stored information, affidavits and declarations, stipulations, admissions, and interrogatory answers. Fed. R. Civ. P. 56. Thus, unverified pleadings, such as unverified complaints, are not considered Rule 56 evidence.

In this case, McCarthy has alleged facts based upon her SAC. Her SAC is not a verified complaint. Thus, the alleged facts cited by McCarthy based solely on her SAC will not be considered for purposes of the pending Motions for Summary Judgment, unless, of course, they are undisputed. Also, where either party provides no citation to Rule 56 evidence, their factual allegations will not be considered.

### The Parties

McCarthy worked for API from April 2, 1990, until May 8, 2009, when she turned 65

years of age and retired. (Deposition of Kathleen A. McCarthy ("McCarthy Dep.") 48-49 Dec. 13, 2011.) McCarthy was a bargaining unit employee holding the position of PAR in the Publishing Unit of API's Dayton office. (Deposition of David Zawisa ("Zawisa Dep.") 14 Apr. 3, 2012.) During her employment, her employment relationship with API was governed by a Collective Bargaining Agreement (the "CBA") between API and the Communications Workers of America ("CWA"). ((Deposition of Dedra Clark ("Clark Dep.") 15, 24, 42-45.) The CBA governing McCarthy's employment relationship was effective August 14, 2005. (Clark Dep. 42.)

API's Dayton office housed a segment of API's Midwest Publishing unit. (Clark Dep. 5-6.) The Midwest Publishing unit was under Director Dedra Clark ("Clark"). (Id.) A Sales unit, under General Sales Manager David Evans ("Evans"), was also located in the Dayton office. (Deposition of David Evans ("Evans Dep.") 10-11 Dec. 13, 2011.) David Zawisa ("Zawisa") was the Manager of Publishing and Design Service in the Dayton office, and, as such, was McCarthy's supervisor. (Zawisa Dep. 11, 14.)

There were employees in both of these units classified as "Staff Associate IIIs." (Clark Dep. 15, 24.) Staff Associate IIIs were called "PARs" in the Publishing unit and "Crew Clerks" in the Sales unit. (Id.)

### API'S 2008 Workforce Reduction

Throughout 2008, API reduced its workforce in furtherance of business needs, primarily a decline in revenues. (Clark Dep. 50; Deposition of Gary Winkler ("Winkler Dep.") 28-29 May 3, 2012.) On July 1, 2008, an employee surplus was declared that affected both the Publishing and Sales units in the Dayton office. (Winker Dep. 28-30.)

Under the terms of the CBA, employees holding a position in a job classification to be

downsized would be surplused based upon seniority in departmental units. (CBA, Art. 27, p. 51.)

Departmental units are defined in the CBA as "the work units, locations and/or job

classifications shown in Exhibit B and any other future units created within those locations."

In 2008, the surplus was implemented by department. (Winkler Dep. 19.) The job

classifications to be downsized were declared by the department heads and employees holding a

position in a job classification to be downsized would be surplused based upon seniority. (Id. at

19-20, 26.) The procedure followed in 2008 required the least senior person to be surplused

among employees in the same office, job classification and departmental unit. (Id. at 28.)

Based upon discussions with the CWA, this procedure was changed for the 2009 and

subsequent workforce reductions. (Id. at 41.) For 2009 and beyond, all individuals in the same

job classification at a location, regardless of the department unit, were surplused based upon

seniority. (Id.)

Per API's business needs, two PAR positions in its Dayton office's Publishing unit were

declared surplus. (Clark Dep. 19.) One crew clerk position in the Dayton office's Sales unit was

declared surplus. (Evans Dep. 17.)

At that time, McCarthy was the PAR with the lowest seniority and Angela Saylor

("Saylor") was the PAR with the next lowest seniority in the Dayton office's Publishing unit.

(Evans Dep. 31-32.) Therefore, McCarthy and Saylor were selected to be surplused from the

Publishing unit. (Winkler Dep. 30; Evans Dep. 31-32.) William Chestnut ("Chestnut") was the

crew clerk with the lowest seniority in the Dayton office's Sales unit and was, therefore, selected

to be surplused from the Sales unit. (Winkler Dep. 30; Evans Dep. 18-19; Clark Dep. 20.)

McCarthy, Saylor and Chestnut were all in the Staff Associate III job position but in different

departmental units located at the Dayton office. (Winkler Dep. 30; Evans Dep. 13-14.)

At the time of the 2008 surplus, there were eleven Staff Associate IIIs in the Dayton office. (Affidavit of Kathleen A. McCarthy ("McCarthy Aff.") ¶ 3 Sept. 9, 2012.) Of the nine Staff Associate IIIs that remained after two volunteered to leave, McCarthy was the oldest. (Id. at ¶ 6.) Of the nine remaining Staff Associate IIIs, two were male: Bill Chestnut ("Chestnut") and Roark Plummer ("Plummer"). (Id. at ¶ 7.) Chestnut had approximately two (2) years of seniority and Plummer had approximately three (3) years. (Id. at ¶ 7.) McCarthy was surplused and Chestnut and Plummer did not end up being surplused. (McCarthy Dep. 56-58; Winkler Dep. 60.)

Along with declaring the surplus, API offered employees within the job classifications declared to have a surplus, the opportunity to participate in a voluntary severance program called the "Interest In Leaving" program. (Winkler Dep. 29-30.) Pursuant to the Interest In Leaving Program, employees who expressed an interest in leaving would be paid their term pay (a severance package) according to the contract and could then leave API. (Id. at 32, 34.) API accepted as many volunteers from the Interest In Leave Program as it had declared surplus positions. (Id. at 33.) The purpose of API's Interest In Leave program was to "help alleviate involuntary termination caused by a declared surplus." (Id. At 35.)

Two crew clerks in the Dayton office's Sales unit, Judy Oiler ("Oiler") and Jean Hogan ("Hogan"), who were not being surplused, expressed a desire to participate in the Interest In Leaving program. (Evans Dep. 20; Winkler Dep. 31-21.) As a result of Oiler and Hogan expressing an interest in leaving the Sales unit, the crew clerk position in the Sales unit was no longer surplus. (Winkler Dep. 31-32; Evans Dep. 20, Clark Dep. 75-76.) Thus, Chestnut, the

least senior individual in that position in the Sales unit was no longer declared surplus. (Id.)

API then determined that one PAR who was going to be surplused could be saved by moving that individual to the crew clerk position vacated by a crew clerk who was interested in leaving. (Evans Dep. 23, Winkler Dep. 31-32.) Because Saylor had more seniority than McCarthy, Saylor would need to be moved to the crew clerk position in the Sales unit. (Winkler Dep. 32.) However, Gloria Smith ("Smith"), another PAR in the Publishing unit volunteered to move to the crew clerk position in the Sales unit. (Winker Dep. 31-32, Evans Dep. 24.) Smith had more seniority than Saylor and Smith was struggling in her PAR position, so Smith was subsequently moved. (Winkler Dep. 32; Evans Dep. 24.) Saylor remained in the Publishing unit. (Evans Dep. 23.)

### The Resource Toolkit

As a surplused employee, McCarthy was furnished a "Resource Toolkit." (McCarthy Dep. 62-64, Ex. Q (AT&T 05110-05123).) The Resource Toolkit informed McCarthy that she had four choices. She could elect to apply for posted openings within the Midwest Yellow Pages. She could apply for other available openings within AT&T. She could terminate her employment on the Force Disposition Date of July 25, 2008 and be eligible for a "Termination Payment," or she could become a part of the Employment Opportunity Pool and remain on the payroll while she continued to search for another position.

Employees with five or more years of service as of August 14, 2005, who were surplused could enter the Employment Opportunity Pool by completing an Employment Opportunity Agreement ("EOA"). (McCarthy Dep. 62-64, Ex. Q (AT&T 05110-05123).) Employees who completed an EOA were to perform traditional or non-traditional work at 85% of their regular

base wages until they found another job or exhausted their Termination Pay entitlement.[1] Also, employees in the Employment Opportunity Pool continued to receive benefits and accrue net credited service. To enter the Equal Opportunity Pool, an employee had to complete and submit an EOA.

The Resource Toolkit also provided contact information for benefit questions. (McCarthy Dep. 62-64, Ex. Q (AT&T 05110-05123). Fidelity was to be contacted regarding questions about pensions and 401k plans. The AT&T Health Benefits Center was to be contacted regarding insurances and COBRA Continuation. Information regarding insurances and COBRA was also available on-line through the Company intranet HR OneStop site. Finally, SHPS was to be contacted regarding flexible spending accounts.

### The Plan Administrator

During this time, AT&T was the administrator of the pension and health and welfare plans applicable to API employees. (Deposition of Rhonda Stone ("Stone Dep.") 19-20 May 11, 2012; Deposition of Larhonda Duncan ("Duncan Dep.") 6-7, 19-20 May 11, 2012.) AT&T had different vendors who administered its pension and health and welfare plans. (Id.) Fidelity administered the pension plan applicable to API employees. (Stone Dep. 23-24; Duncan Dep. 6-8.) Aon Hewitt ("Hewitt") administered the health and welfare plans for API employees. (Stone Dep. 6; Duncan Dep. 19.) Finally, McCarthy's eligibility standard for her pension plan was different from the eligibility standard for her health and welfare benefits. (Stone Dep. 9-11,

---

[1]The CBA provides that an employee can remain in the Employment Opportunity Pool and continue to receive compensation even after the severance had been depleted until either (1) the employee refused an assignment, (2) the company's funding of the Employment Opportunity Pool was exhausted; or (3) the Employment Opportunity Pool Agreement between Ameritech and the CWA expired.

Duncan Dep. 19-20.)

## McCarthy's Actions

Beginning on the date she received the notice of surplus, McCarthy attempted to determine whether she could retire with medical benefits. (McCarthy Dep. 22-25.) She spoke with what she termed a "retirement specialist" at least seven (7) times. (Id., Ex. 42.) Each time she was told that she could retire with benefits. (Id. at 25.) Although she called "the number that was listed on our information sheet, McCarthy does not remember who the retirement specialists were or how the phone was answered on the other end." (Id. at 25-26.)

After participating on one of the calls to a "retirement specialist" with McCarthy, Zawisa, McCarthy's supervisor, told her that she could not retire with benefits. (Id. at 27.) Zawisa testifies that the call that McCarthy made that he was a part of was made to Fidelity. (Zawisa Dep. 42, 48.)

Zawisa was told by Bruce Piombo, his supervisor, that McCarthy could not retire with full benefits in August of 2008. (Id. at 43.) Zawisa was also told by Manager Dwight Cameron (Cameron") near the end of July of 2008, that McCarthy could not retire with benefits in August of 2008. (Id. at 44.)

Hewitt later determined that McCarthy was eligible to leave API with post-retirement healthcare during the summer of 2008. (Defs.' Mot. Summ. J., Ex. 15.) Also, AT&T later determined that McCarthy was not eligible to receive a service pension as of the summer of 2008. (Stone Dep. 9.) McCarthy was not eligible to receive a service pension then because she did not meet the "modified rule of 75." (Id. at 9-10.) She would have had to have had at least 25 years of service and be age 50 or have 20 years of service and be age 55. (Id. at 10.) As of

August of 2008, McCarthy was 64 years of age with 19 years of service. (Evans Dep. 115, Ex. 3, SAMS for McCarthy.) McCarthy was, however, entitled to an accrued benefit under the Midwest Publishing Ventures Program. (Id. at 11.)

McCarthy elected to enter the Employment Opportunity Pool and signed an EOA on August 14, 2008. (McCarthy Dep. 37-38, Ex. 17.) At her deposition, McCarthy testified that she did not terminate her employment in August of 2008 because she was afraid that she was not going to get her benefits. (Id. At 28.)

In her deposition, McCarthy testified that she wanted to "retire with benefits" in August of 2008. (Id. at 22-25.) Later, in an Affidavit dated September 6, 2012, McCarthy says she would not have entered into the Employment Opportunity Pool and depleted her severance if she had been told that she was eligible to receive retirement medical benefits as of August 2008. (McCarthy Aff. ¶ 17.)

McCarthy also filed a grievance regarding her bumping rights. (McCarthy Dep. 55.) She argued that she should not be surplused because there were still other people in the Staff Associate III position in other departments in the Dayton office with less seniority than her. (Id.) The CWA declined to pursue this grievance, finding that "the Employer has taken a stance as to what a 'Work Unit' is and this issue is best resolved at Bargaining." (Defs.' Mot. Summ. J., Ex. 23.)

McCarthy remained employed by API until May 8, 2009, when she retired. (McCarthy Dep. 48-49.) From August 15, 2008, until May 8, 2009, she received wages at a rate of 85% of her original salary, retained her active employee benefits and accrued service credit towards her pension, as provided in the EOA and the CBA. (Evans Dep. 128, Ex. 46.) The 85% of annual

pay is paid out of the Termination Pay entitlement. (Id.)

## Plan Documents

McCarthy avers that she has been asking API and AT&T for copies of the Plan documents that say whether or not she was eligible for retirement medical benefits as of August 15, 2008, since July 23, 2008. (McCarthy Aff. ¶ 20; McCarthy Dep. 33, 78.) She also avers that her requests have been made both verbally and in writing. (Id.)

McCarthy's counsel also avers that she has made at least three attempts to obtain the plan documents. (Affidavit of Karen T. Dunlevy, Esq. ("Dunlevy Aff.") ¶¶ 3, 4 and 5 June 7, 2012.) The first request was contained in a letter to Piombo, an AT&T senior manager, dated October 2, 2009. (Id. at ¶ 3.) This letter included the following statement: "Please allow this letter to serve as a second request on Kathleen's behalf for copies of all Plan documents, including the Berry Plan and any documents reflecting how employees should be grandfathered into that Plan, as well as documents relating to the current Plan." (Id. at ¶ 3.) Neither AT&T nor API responded. (Id.)

The second request was in a letter, dated January 12, 2010, to the Vice President, General Counsel and Secretary of AT&T. (Id. at ¶ 4.) The October 2, 2009 letter was attached to this second letter. (Id.) No response was received. (Id.)

The third request was in a Request for Production of Documents served on the Defendants on December 30, 2010. (Id. at ¶ 5.) This discovery included a request for all documents relating in any way to McCarthy's retirement benefits. (Id.) This discovery also included a request that the Defendants identify where in the documents produced the issue of McCarthy's entitlement to post-retirement medical benefits is addressed. (Id. at ¶ 6.) Following

an Order compelling a response, the Defendants acknowledged that they did not know where the issue of McCarthy's entitlement to retirement medical benefits was addressed in the Plan documents. (Id.)

On May 10, 2012, the Defendants produced, for the first time, an email chain dated August 19, 2008 in which Cameron was informed that, following research from the AT&T Benefits Center, it was determined that McCarthy was eligible for post-retirement medical benefits. (Id. at ¶ 10.) This email was not included in the Defendants' prior production of documents which included various other emails to/from Cameron. (Id.) On May 11, 2012, Larhonda Duncan, an AT&T Lead Benefits Consultant, testified that she had determined that McCarthy was eligible for post-retirement healthcare benefits. (Duncan Dep. 6, 17.)

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving

party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, declarations, stipulations, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c)(1)(A).

In this case, McCarthy brings eight (8) Claims for Relief. A cross-motion for summary judgment is pending on one of these Claims. Each of the eight (8) Claims will be addressed seriatim.

## FIRST CLAIM:  ADEA VIOLATION

The Defendants argue that McCarthy cannot satisfy all of the elements of an age discrimination claim and, if she could, that she cannot show pretext. McCarthy responds that she can satisfy all of the prima facie elements of an age discrimination claim and that she can demonstrate pretext.

The ADEA prohibits an employer from failing to hire, discharging or discriminating against an individual with respect to her compensation or terms, conditions or privileges of employment because of her age. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009)(citing 29 U.S.C. § 623(a)(1)). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *Id.* In this case, McCarthy does not identify direct evidence of

age discrimination, that is evidence which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor in API's decision to surplus her. Thus, McCarthy's age discrimination complaint is analyzed under the *McDonnell Douglas* burden shifting framework. *Id.* at 622.

On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine issue of material fact at each stage of the *McDonnell Douglas* analysis. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). However, "[c]onclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

### McDonnell Douglas Burden-Shifting Framework

The *McDonnell Douglas* burden-shifting framework provides an allocation of the burden of production and an order for the presentation of proof in disparate treatment cases. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)). The framework is designed to "sharpen the inquiry to a level of specificity which best allows the fact-finder to resolve the ultimate question: whether the plaintiff established by a preponderance of the evidence that the defendant intentionally discriminated against her." *Cline*, 206 F.3d at 660(citing *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

Under the *McDonnell Douglas* burden shifting framework, a plaintiff must first set forth a prima facie case of discrimination. *Arendale*, 519 F.3d at 603 (citing *Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001)). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason or reasons for its actions. *Id.* If the employer

does so, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. *Id.* The ultimate burden of persuasion remains at all times with the plaintiff. *Id.*

A prima facie case of age discrimination is made by showing the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to an adverse employment decision; (3) the plaintiff was qualified for the position; and (4) the plaintiff was replaced by someone outside the protected class. *Id.* at 622-23. If the termination arises as part of a workforce reduction, the fourth element is modified to require the plaintiff to provide additional direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons. *Id.* at 623.

For example, a plaintiff could establish a prima facie case by showing that she had qualifications superior to those of a younger co-worker working in the same position or could show that the employer made statements showing a discriminatory motive. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990). Whatever the evidence is, it must be sufficient to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age. *Id.*

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment decision. *Arendale*, 519 F.3d at 603. If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the legitimate nondiscriminatory reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Clay*, 501 F.3d at 704 (citing *Johnson v Kroger Co.*, 319 F.3d

858, 866 (6th Cir. 2003)). A reason cannot be a pretext for discrimination unless it is shown that the reason is both false and that discrimination was the real reason. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)(citing *St. Mary's Honor Center*, 509 U.S. 502). Finally, to show pretext, an employee may not rely upon her prima facie evidence, but must, instead, introduce additional evidence of discrimination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Consideration of pretext focuses on the defendant's beliefs and not on the plaintiff's own perceptions. *Scott v. Thomas & King, Inc.*, No. 3:09-CV-147, 2010 WL 2630166 at *8 (S.D. Ohio June 28, 2010.) Self-serving statements by the plaintiff that she believes that she was discriminated against because of age are not enough. *Id.*

The reasonableness of an employer's decision may be considered to the extent that such a question sheds light on whether the employer's proffered reason for the employment decision was its actual motivation. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)(citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). If the employer demonstrates that its actions, while perhaps "mistaken, foolish, trivial, or baseless," were not taken with discriminatory intent, the employer arguably lacks the discriminatory intent which is the focus of a discrimination suit. *Clay*, 501 F.3d at 715(quoting *Smith*, 155 F.3d at 806).

**Prima Facie Case**

The first three elements of a prima facie case of age discrimination are not in dispute in this case. Due to her age, McCarthy was a member of a class protected by the ADEA. Further, McCarthy was subjected to a workforce reduction which was adverse to her. Finally, there is no evidence that McCarthy was not qualified for the PAR position.

-16-

The Parties dispute whether McCarthy can present evidence satisfying the fourth element of a prima facie case of age discrimination. This case involves a workforce reduction so the fourth element is additional direct, circumstantial or statistical evidence tending to indicate that API singled out McCarthy for discharge for impermissible reasons.

The Defendants argue that McCarthy has presented no evidence satisfying the fourth element. McCarthy identifies evidence which she says satisfies the fourth element. Each piece of evidence that McCarthy identifies will be addressed seriatim.

McCarthy begins with a list of allegedly undisputed facts. Whether or not they are disputed is immaterial at this point because they are supported by Rule 56 evidence. The alleged undisputed facts identified by McCarthy are:

Three staff associate III positions were being surplused in the Dayton Office.

Two of those surplused positions were saved as a result of the approval of Interest In Leave requests from two Staff Associate IIIs.

Of the remaining nine Staff Associate IIIs, McCarthy was the oldest at 64, and the next youngest was twelve (12) years younger than her.

McCarthy had more seniority compared to Chestnut and Plummer, who were substantially younger Staff Associate IIIs and the only two males.

McCarthy was terminated in lieu of either of the two substantially younger and male Staff Associate IIIs with less seniority.

The three Staff Associate IIIs who were no longer employed at Ameritech as a result of the surplus initiative in 2008 were 65, 64 and 61 years old.

The average age of the Staff Associate IIIs following the RIF was 44 - twenty years less than McCarthy.

While these facts may be undisputed, they are not evidence that API singled out McCarthy for layoff for impermissible reasons. There is Rule 56 evidence that McCarthy was

selected for lay-off in accordance with then-governing CBA requirements.

McCarthy also identifies what she calls additional evidence of API's manipulation of the implementation of the reduction in force which shows that the reduction in force was the product of discriminatory motives. She argues that this additional evidence satisfies the fourth element of a prima facie case of age discrimination.

The first evidence of manipulation identified by McCarthy is an intention to "save" Chestnut from the 2008 workforce reduction by an API General Manager and by API's Director of Labor Relations. Other evidence of alleged manipulation is that same General Manager's intent to solicit volunteers from the combined group of Staff Associate IIIs which contradicts API's claim that the surplus of crew clerks should be kept separate from the surplus of PARs.

Chestnut was initially surplused from the Dayton office's Sales unit but avoided being terminated when two employees in the same work unit as he opted for the Interest In Leaving program. There were no longer too many crew clerks in the Dayton Offices's Sales unit. Thus, Chestnut was no longer surplus.

As for soliciting volunteers for the Interest In Leaving program, the manager for the Sales Unit solicited volunteers from the Sales Unit and the manager for the Publishing Unit solicited volunteers from the Publishing Unit. Thus, there is not evidence, as McCarthy asserts that there is, that a General Manager intended to solicit volunteers from the combined group of Staff Associate IIIs.

McCarthy has not identified Rule 56 evidence that an API General Manager intended to solicit volunteers from the combined group of Staff Associate IIIs. There is Rule 56 evidence that both groups were solicited but not evidence that the solicitation was done by the same

individual.

Even if McCarthy could present evidence of an intention to "save" Chestnut, she would still have to show either that the entire procedure that was followed was designed to "save" Chestnut or that someone did not follow the procedure. She has done neither.

McCarthy also argues that API's false statements to her regarding her eligibility for retirement medical benefits was made with the intent of tricking her into participating in the EOP, are also consistent with a discriminatory motive. First, while API may have not properly informed McCarthy of her eligibility for retirement medical benefits, there is no Rule 56 evidence from which a reasonable person could infer that API intended to trick McCarthy. Also, McCarthy voluntarily joined the EOP program. Thus, API's statements to McCarthy regarding her eligibility for retirement medical benefits are not additional direct, circumstantial or statistical evidence tending to indicate that API singled out McCarthy for discharge for impermissible reasons. If API wanted intentionally to get rid of McCarthy, API could have told McCarthy that she was eligible for post-retirement medical benefits. According to McCarthy's testimony, she would have then left API.

McCarthy also argues that the way she was treated subsequent to the reduction in force suggests a discriminatory motive. However, McCarthy's treatment subsequent to the workforce reduction is not relevant to her claim that she was discriminated against by API due to her age when her employment was terminated.

McCarthy next argues that the foregoing evidence, combined with the evidence addressed under pretext, is more than sufficient to satisfy her burden on the fourth element of a prima facie case. The foregoing evidence has been addressed above. The evidence "addressed

under pretext" has yet to be addressed.

McCarthy cannot rely upon her prima facie evidence to show pretext, but must, instead, introduce additional evidence of discrimination. *Manzer,* 29 F.3d at 1084. Thus, if the Court uses the evidence that McCarthy wishes it to use to address her prima facie case, she cannot use the same evidence to show pretext. However, since McCarthy has not yet identified evidence that satisfies the fourth element of a prima facie case, the Court will consider the additional arguments that McCarthy identifies under pretext.

McCarthy's first argument under pretext is that McCarthy did not have the least seniority as required by API's 2008 Workforce Reduction process. According to McCarthy, a factual dispute exists as to whether McCarthy's seniority should have been compared to all of the Staff Associate IIIs or just to the other PARS.

However, the Court is unable to identify Rule 56 evidence of this factual dispute beyond McCarthy's self-serving beliefs. The Rule 56 evidence indicates that API followed its plan in accordance with the CBA when conducting the 2008 Workforce Reduction and McCarthy has not identified evidence to the contrary. At the time, McCarthy unsuccessfully grieved that her seniority should have been compared to all Staff Associate IIIs. The way seniority is considered was changed during collective bargaining following the 2008 Workforce Reduction, but just because it was changed, does not mean it was discriminatory at the time.

McCarthy's next argument under pretext is that two substantially younger male Staff Associate IIIs with less seniority were spared from surplus while she was terminated. This is essentially the same argument as immediately above with the same result. Only here, McCarthy argues that API's argument regarding the consideration of seniority by department does not

"pass the straight face test" for one "simple" reason - under "identical" circumstances in 2009, the Staff Associate IIIs were combined and the employee with the least seniority in the combined group was surplused. McCarthy seems to be saying that if a company begins to do something in a new way, she had to have been discriminated against if she was treated in the old way. This is, of course, absurd, particularly where, as here, the new way was collectively bargained. Besides, McCarthy has the burden to show additional direct or circumstantial evidence tending to indicate that API singled her out for impermissible reasons. While a change in practice may indicate that there were problems with the prior practice, the change does not necessarily show that the old practice singled out one individual for impermissible reasons.

McCarthy's next argument is that API applied company policy differently to employees inside and outside of a protected class. *See Russel v. United Parcel Service*, 673 N.E.2d 659, 663-64 (Ohio Ct. App. 1996). The company policy that McCarthy refers to is how API determined who would be surplused. In 2008, the surplusing was done based upon seniority within departmental units and in 2009 the surplusing was done within job classifications, regardless of which department the job classification was in.[2] If the method used in 2009 would have been used in 2008, McCarthy would not have been surplused. However, this is not evidence that API applied company policy differently to employees inside and outside of a protected class. It is evidence that API changed the way individuals were surplused for its 2009 workforce reduction and the change was made at the behest of and with the agreement of the CWA.

McCarthy's next argument is that API manipulated the selection of surplus employees by

---

[2]McCarthy cites depositions for the proposition that an API General Manager and Director of Labor Relations agree that the method used in 2009 is the appropriate method. However, this is a misinterpretation of their deposition testimony.

failing to group all Staff Associate IIIs together for purposes of comparing seniority in 2008 but combined them for purposes of soliciting Interest In Leaving volunteers. First of all, the selection of employees to be surplused was not manipulated. Individuals were selected based upon API's workforce reduction policy and the CBA. Second, employees were not combined for purposes of soliciting Interest In Leaving volunteers. Each departmental unit head solicited the Staff Associate IIIs in his or her department.

Perhaps what McCarthy is referring to is the fact that one Crew Clerk was surplused and two Crew Clerks volunteered for the Interest In Leaving program. Therefore, API transferred one of the PARs to a Crew Clerk position, thereby reducing the number of PARs that needed to be terminated. However, this transfer was based upon seniority and is not evidence of discrimination. (See Evans Dep. 22-26.)

McCarthy's next argument is that API's misrepresentations concerning her participation in the EOP are evidence of discrimination. McCarthy identifies one alleged misrepresentation - her participation in the EOP would end upon her severance pay running out. McCarthy interprets the CBA to require API to continue to pay those in the EOP after the amount of their termination pay runs out until she secured another position, the funding for the EOP was exhausted or the EOP Agreement between API and the CWA terminated. Thus, according to McCarthy, the EOP Agreement is not consistent with CBA language. However, it is. The CBA provides that the total amount of income continuation installments paid to an opportunity employee equals the total amount of termination payment which the opportunity employee is to receive. That is what is indicated in the EOP Agreement. Further, if McCarthy did not agree that the EOP Agreement was consistent with the CBA, she could have filed a grievance at the time.

Even if there were an inconsistency between the EOP Agreement and the CBA, since all other employees received the exact same opportunity going into the EOP as McCarthy did, she can hardly call this discrimination. Also, there is no evidence that employees who opted to go into the EOP were allowed to stay there and receive wages beyond the exhaustion of the amount of their termination pay.

The Court has considered all of the alleged evidence that McCarthy identified regarding the fourth element of a prima facie case of age discrimination and all of the evidence McCarthy identified as showing pretext. Yet, McCarthy has not identified direct, circumstantial or statistical evidence tending to indicate that API singled out McCarthy for discharge let alone for impermissible reasons based upon her age. McCarthy has not identified evidence that satisfies the fourth prima facie element of an age discrimination claim in a workforce reduction setting.

### Legitimate, Non-Discriminatory Reason

Even though McCarthy has not identified evidence showing a prima facie case of age discrimination, the Court will consider the remaining evidentiary burdens in the *McDonnell Douglas* burden shifting framework. The next step is for API to articulate a legitimate, non-discriminatory reason for surplusing McCarthy. This API has done.

API asserts that McCarthy was selected to be surplused solely on the basis of seniority in her departmental unit, the precise procedure set forth in the CBA. No factors, including sex, age, performance or skills were considered in the selection process. API's senior management in St. Louis identified the specific positions to be surplused and no discretion was provided to any management personnel in McCarthy's chain of command.

### Pretext

API has articulated a legitimate, non-discriminatory reason for surplusing McCarthy. The burden next shifts to McCarthy to show that API's reason is a pretext for discrimination. To show pretext, McCarthy must present evidence that API's reason either had no basis in fact, did not actually motivate API's challenged conduct or was insufficient to warrant the challenged conduct.

To show pretext, an employee may not rely upon her prima facie evidence, but must, instead, introduce additional evidence of discrimination. Even though McCarthy's alleged evidence of pretext was considered for purposes of trying to make a prima facie case, in the interest of justice, her alleged pretext evidence is again considered.

McCarthy offers five (5) arguments for pretext: (1) her seniority should have been compared to all of the Staff Associate IIIs; (2) API applied company policy differently to employees inside and outside of the protected class; (3) although API refused to combine the PARs and Crew Clerks for comparing seniority, it combined them for soliciting Interest In Leaving volunteers; (4) API's inconsistent rules for implementing the surplus was a deliberate manipulation of the process; and (5) API's misrepresentation concerning her participation in the EOP is additional evidence of discrimination. Each has been addressed above, and none of them constitute evidence that API's legitimate, non-discriminatory reason for surplusing McCarthy either had no basis in fact, did not actually motivate API's challenged conduct or was insufficient to warrant the challenged conduct. Thus, McCarthy has not identified evidence showing that API's legitimate, non-discriminatory reason was a pretext for discrimination.

### Conclusion On ADEA Claim

McCarthy has not identified evidence satisfying all of the prima facie elements of an

ADEA claim. If she could identify evidence of a prima facie case, she has not identified evidence that API's legitimate, non-discriminatory reason for surplusing her was a pretext for age discrimination. Therefore, there are no genuine issues of material fact and API is entitled to judgment as a matter of law on McCarthy's First Claim for Relief for age discrimination in violation of the ADEA.

## SECOND CLAIM: GENDER DISCRIMINATION

McCarthy's Second Claim for Relief is against API for gender discrimination in violation of Title VII and Ohio Rev. Code § 4112. The Defendants argue that McCarthy cannot satisfy all of the elements of a gender discrimination claim and, if she could, that she cannot show pretext. McCarthy responds that she can satisfy all of the prima facie elements of a gender discrimination claim and that she can demonstrate pretext.

McCarthy's Second Claim for Relief for gender discrimination is brought pursuant to Title VII and Ohio Rev. Code § 4112. The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to cases involving alleged violations of Ohio Rev. Code Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 421 N.E.2d 128, 131 (Ohio 1981). Thus, this Court will use federal case law to analyze McCarthy's Title VII claim, and the Parties have not argued otherwise.

Title VII makes it an unlawful employment practice for an employer to discriminate against any individual with respect to, among other things, the individual's gender. 42 U.S.C. § 2000e-2(a)(1). As with an age discrimination claim, an individual may establish gender discrimination by either direct or circumstantial evidence. *Vaughn v. Louisville Water Co.*, 302 Fed. App'x 337, 344 (6th Cir. 2008).

In this case, McCarthy does not identify direct evidence of gender discrimination, that is evidence which, if believed, would require the conclusion that unlawful discrimination was at least a motivating factor in API's decision to surplus her. Thus, McCarthy's gender discrimination complaint is analyzed under the *McDonnell Douglas* burden shifting framework which is more fully set forth above. *Id.* at 345. Also, the prima facie elements of a gender discrimination claim in the context of a workforce reduction are the same as the prima facie elements of an age discrimination claim in the context of a workforce reduction. *Geiger*, 579 F.3d at 622-23; *Gragg v. Somercet Technical College*, 373 F.3d 763, 767-68 (6th Cir. 2004).

The evidence identified by McCarthy to support her age discrimination claim is essentially the same evidence as she identified to support her gender discrimination claim. The applicable law is the same for McCarthy's age discrimination claim and her gender discrimination claim, and none of the Parties has argued otherwise. Therefore, the results must be the same. There are no genuine issues of material fact and API is entitled to judgment as a matter of law on McCarthy's Second Claim for Relief for gender discrimination in violation of Title VII and Ohio Rev. Code § 4112.

### THIRD CLAIM:  ERISA - FAILURE TO PROVIDE DOCUMENTS

Both McCarthy and AT&T have moved for summary judgment on this claim. AT&T argues that it is entitled to summary judgment because McCarthy failed to properly make a request for plan documents. McCarthy argues that she is entitled to summary judgment and requests statutory damages and attorneys' fees for willful non-disclosure of the plan documents.

It is undisputed that AT&T is the administrator of an employee benefit plan under which McCarthy is entitled to benefits, and this employment benefit plan is subject to ERISA.

Administrators of ERISA-governed plans are subject to the disclosure requirements set forth in 29 U.S.C. §§ 1024 and 1025.

## Applicable Regulations

Section 1024(b)(4) requires the plan administrator to:

> upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.…"

Section 1025(a) requires the administrator of a defined benefit plan, such as the retirement plan in which McCarthy participated, to furnish a pension benefit statement to a participant or beneficiary of the plan upon written request. The benefit statement must indicate the total benefits accrued and the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which benefits will become nonforfeitable.

Finally, 29 U.S.C. § 1132(c)(1) provides that:

> Any administrator… who fails or refuses to comply with a request for information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 per day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation… shall be treated as a separate violation.

For violations occurring after July 29, 1977, the maximum amount of civil monetary penalty is increased from $100 per day to $110 per day. 29 C.F.R. § 2575.502c-1.  Finally, the Sixth Circuit has held that only a plan administrator can be held liable under § 1132(c) and has interpreted the "date of such failure or refusal" to mean that penalty calculations begin thirty-one

(31) days after the document request was made. *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1069

(6th Cir. 1994); *Vanderklok v. Provident Life and Accident Insurance Co., Inc.*, 956 F.2d 610,

618 (6th Cir. 1992).

## McCarthy's Requests

McCarthy alleges that she made several attempts to obtain the plan documents for

retirement and/or retirement medical benefits. And, while certain plan documents were provided,

no plan documents were provided within 30 says after requested. The requests identified by

McCarthy were as follows:

1. McCarthy alleges that she first requested plan documents on July 23, 2008, in a telephone call with "Bill." (McCarthy's handwritten notes, Ex. 14.) However, her notes do not indicate that she asked "Bill" for plan documents.

2. A letter dated October 2, 2009, from McCarthy's counsel to AT&T Senior Manager Bruce Piombo, requests "copies of all Plan documents, including the Berry Plan, and any documents reflecting how employees should be grandfathered into that Plan, as well as documents relating to the current plan." (Defs. Mem. In Opp., doc. #72, Ex. 32.) However, this letter discusses McCarthy's retirement and does not specifically seek documents regarding post-retirement medical benefits. (Id.)

3. To a letter dated January 12, 2010, from McCarthy's counsel to AT&T Vice President, General Counsel and Secretary, McCarthy attached the October 2, 2009 letter to Bruce Piombo which requests "copies of all Plan documents, including the Berry Plan, and any documents reflecting how employees should be grandfathered into that Plan, as well as documents relating to the current plan." (Id., Ex. 33.) The January 12, 2010 letter itself does not request any plan documents. (Id.)

4. Plaintiff's First Request for Production of Documents Propounded Upon the Defendants (Ameritech Publishing Inc. d/b/a Advertising Solutions and Ameritech Publishing Inc. d/b/a A&T Advertising and Publishing) dated December 30, 2010, requests "all documents pertaining to any plan for retirement or retirement medical benefits, which have at any time applied to Kathleen McCarthy. Please include in your response all summary plan descriptions and full plan documents.…" (Id. Ex. 52.)

5. A letter dated April 27, 2011, from McCarthy's counsel to API's counsel asks for reconsideration of responses to discovery requests including "please supplement your response with the applicable Plan documents." (Plt. Mot. For Order Compelling Discovery, doc. #25, Ex. A.)

6. Plaintiff's Third Request for Production of Documents, Second Set of Interrogatories and Third Set of Request for Admissions Propounded upon the Defendants (Ameritech Publishing d/b/a AT&T Advertising Solutions and d/b/a A&T Advertising and Publishing) dated June 17, 2011, requests these Defendants to "identify (by Bates-stamp number referencing documents produced by the Defendants) every page which specifically addresses the issue of whether McCarthy was or was not entitled to receive retirement medical benefits if she had been terminated on April 15, 2008, in conjunction with the Midwest Force Disposition." (Defs. Mem. In Opp., doc. #72, Ex. 54.)

7. Plaintiff's Fourth Request for Production of Documents and Third Set of Interrogatories Propounded Upon the Defendant Ameritech Publishing, Inc., dated July 29, 2011, requests this Defendant to "identify (by Bates-stamp number, page reference, or otherwise) each page within the documents produced in response to the Plaintiff's requests for production of documents, which relates to and/or addresses the issue of whether McCarthy was or was not entitled to receive retirement medical benefits if she had been terminated from her employment with Ameritech on August 15, 2008." (Id. Ex. 55.)

8. Plaintiff's First Request for Production of Documents and First Set of Interrogatories Propounded Upon the Defendant AT&T, Inc., dated July 29, 2011, requests "all pension and/or welfare benefit plan documents which answer the question whether or not Kathleen McCarthy would have been entitled to receive retirement medical benefits if her employment with Ameritech had been terminated on August 15, 2008." This request also asks AT&T to "identify (by Bates-stamp number, page reference, or otherwise) each page within the documents produced in response to the Plaintiff's requests for production of documents, which relates to and/or addresses the issue of whether McCarthy was or was not entitled to receive retirement medical benefits if she had been terminated from her employment with Ameritech on August 15, 2008." Finally, this request asks AT&T to "identify by document title, date, and any applicable reference or identification name or number, the plan document(s) which address the issue of what retirement and/or medical benefits McCarthy was entitled to receive in the event her employment had terminated on August 15, 2008." (Id. Ex. 56.)

9. Plaintiff's Motion for an Order Compelling Discovery filed on September 23, 2011, indicates that deficiencies still exist with the Requests for Production of Documents and Interrogatories propounded on Ameritech Publishing and on

AT&T. The deficiencies are directed to the above alleged requests. (Id. Ex. 57.)

10. A subpoena dated December 22, 2011, to the AT&T Benefits Center requested "[a]ll documents relating to Ms. McCarthy's entitlement to post-retirement medical benefits as of August 15, 2008" and "[a]ll documents which answer to the question of whether Ms. McCarthy was entitled to receive post-retirement medical benefits as of August 15, 2008." (Id. Ex. 58.)

11. McCarthy's eleventh request identifies a February 8, 2012 Subpoena to AT&T Corp. McCarthy does not identify where a copy of this alleged subpoena can be found in the record and the Court is unable to find it. Thus, it will not be considered as Rule 56 evidence.

**Analysis**

The Plan Administrator

The Defendants now assert that AT&T is the Plan Administrator. This is not now disputed by McCarthy. However, during the course of this litigation, McCarthy was told something different.

In their Answer to McCarthy's Amended Complaint (doc. #22) filed on July 25, 2011, the Defendants state that they are without sufficient information to either admit or deny that AT&T is the Plan Administrator. Then, on October 7, 2011, the Defendants indicated to the Court that they "have repeatedly notified Plaintiff that Fidelity Service Center is the administrator of those plans and is the entity in possession of any documents. (Defs. Memo In Opp To Mtn To Compel, doc. #29 PAGEID # 417.) In Defendants' Answer to McCarthy's Second Amended Complaint (doc. #71) filed on July 26, 2012, they again state that they are without sufficient information to either admit or deny that AT&T is the Plan Administrator.

The Defendants attempt to circumvent this issue by pointing to several guides provided to all of its employees by AT&T (Declaration of Jeremy Siegel ¶ 3 May 4, 2012.) Presumably McCarthy received these guides.

Relevant to this case, where the operative events occurred during 2008, is a "Where to Go for More Information" guide dated January 2008. (Defs' Memo In Opp, doc. #72, Ex. 28.) This guide has a section entitled "Requests for Copies of Documents." This section directs employees to visit an administrator directly at a listed address to obtain a summary plan description, a summary of material modifications or a printed policy. The AT&T Benefits Center is listed, both address and telephone number, as the contact for medical plans and the Fidelity Service Center is listed, both address and telephone number, as the contact for pension plans. Finally, this section indicates that, if an employee wishes to request copies of ERISA plan or program documents or other documents under which an ERISA plan or program is established or operated, the employee must send his or her request in writing to AT&T Inc., P.O. Box 29690, San Antonio, TX 78229. Thus, the guides pointed to by the Defendants appear to tell an employee to call or write the AT&T Benefits Center for a printed medical policy and the Fidelity Service Center for a printed pension plan.

McCarthy admits that she was actually provided with the various guides. (McCarthy Dep. 78-79, 81.) She also admits that she was aware of how to obtain the plan documents on the internet. (Id.)

From the record, it appears that the Defendants may have been evasive about telling McCarthy's counsel the name of the Plan Administrator. Further, the "Where to Go for More Information" guide provided to McCarthy clearly indicates that McCarthy should send a written request to AT&T at a San Antonio address to obtain copies of ERISA plans. However, this guide also indicates that McCarthy may call or write the AT&T Benefits Center to obtain a summary plan description, a summary of material modifications or a printed policy regarding her medical

coverage and may call or write Fidelity to obtain a summary plan description, a summary of material modifications or a printed policy regarding her pension.

Irregardless, AT&T is undisputedly the Plan Administrator. Further, in spite of the alleged evasiveness by AT&T's counsel, McCarthy could easily ascertain from the guide that she needed to make a written request to AT&T at the address provided in the guide.

Next, each of McCarthy's alleged requests will be analyzed to determine if she requested a copy of the applicable medical and retirement plans in writing to the Plan Administrator at the address indicated. If she did, the Court must determine if the Plan Administrator adequately responded within the required thirty (30) days.

Analysis of McCarthy's Requests

Alleged request #1 is not a request for plan documents and will not be further considered. The remaining alleged requests - #2 through #11 - are not written requests for plan documents to the Plan Administrator at the address provided.

McCarthy argues that, while it may be true that API was not the official plan administrator, as a wholly owned subsidiary of AT&T, requests for plan documents made to API should be considered as requests to AT&T. However, McCarthy identifies no law in support of this argument and the Court is aware of none. The applicable statute clearly requires the Plan Administrator to provide the documents and not a wholly-owned subsidiary of the Plan Administrator.

McCarthy also argues that API and AT&T should have known who the Plan Administrator was more so than McCarthy. On this, McCarthy may be correct, even though the Rule 56 evidence indicates that McCarthy too knew or should have known how to properly

obtain ERISA plan documents. However, the statute under which McCarthy is making this claim says nothing about who knows or should know the identity of the Plan Administrator. Thus, this is not a valid excuse for not contacting the Plan Administrator in writing.

McCarthy cites a Sixth Circuit case holding that, when a request is made by an attorney on behalf of a participant, the plan administrator must either provide the requested information directly to the participant or must inform the attorney that the information will be released upon receipt of an authorization signed by the participant. *Minadeo v. ICI Paints*, 398 F.3d 751, 758 (6th Cir. 2005). The *Minadeo* case is, however, not dispositive in this case for at least two reasons. First, there is no evidence that McCarthy or her counsel asked the Plan Administrator for the plan documents in writing at the address specified. Second, *Minadeo* is addressing benefits information which is presumably personal information and which is not the same as a copy of the applicable plan.

The *Minadeo* court did, however, admonish, without legally penalizing, a party's actions with respect to the plaintiff's request for pension benefits information as contrary to the spirit of ERISA. *Id.* at 759-60. Thus, in keeping with the spirit of ERISA as set forth in *Minadeo*, API and AT&T are admonished for not providing the plan information to McCarthy or not specifically telling McCarthy how to obtain the plan information that she wanted.

McCarthy also argues that the letters that her counsel sent to an API senior manager (request #2) and to an AT&T Vice President, General Counsel and Secretary (request #3) are requests to AT&T. However, neither of these requests were written requests to the Plan Administrator.

McCarthy next argues that she propounded Requests for Production of Documents

directly to AT&T on December 7, 2001 and that a subpoena was issued to AT&T on December 7, 2011. However, the Requests for Production of Documents is not a written request to the Plan Administrator for documents and, as set forth above, the alleged subpoena to AT&T is not part of the Rule 56 evidence and thus cannot be considered.

McCarthy next argues that a request for plan documents served upon the plan administrator's attorney is an adequate request under ERISA. As a basis for this argument, she cites *Kanoski v. Sterling Paper Co.*, No. 2:09-cv-00439, 2010 WL 3910483 at * 3 (S.D. Ohio Oct. 4, 2010). In *Kanoski*, Magistrate Judge Abel found that ERISA was not meant to impose upon a plan participant seeking information the inflexible requirement of addressing the request to the current plan administrator. *Id.* at *3. However, Magistrate Judge Abel also found that the thirty (30) day period does not begin until the request is actually received either by the plan administrator or those under the administrator's supervision. *Id.* at *4. And, McCarthy does not identify any evidence of if or when the Plan Administrator or those under the Plan Administrator's supervision actually received any of her requests.

McCarthy also cites *Gregory v. Goodman Manufacturing Co., L.P.*, No. 4:10-cv-23, 2012 WL 685298 (E.D. Tenn. Jan. 13, 2012), for the proposition that repeated requests to the administrator, including the administrator's general counsel, resulted in penalties for failing to provide plan documents. However, in *Goodman*, there was no dispute that Goodman was the administrator of the plan and that the plaintiff made written requests for plan documents. *Id.* at *5. In this case, there is a dispute as to whether McCarthy made proper written requests for plan documents.

McCarthy also cites *Osborn v. Knights of Columbus*, 401 F. Supp.2d 822, (N.D. Ohio

-34-

2005), for the proposition that requests for plan documents sent to the employer's general counsel were properly received. However, in *Osborn*, the plaintiff had sent the letters to the address provided by the Plan Administrator. In this case, McCarthy did not send any of her requests to the address provided by the Plan Administrator.

Other courts have found that a request for plan documents is not actionable if it is not sent to the plan administrator and sent to the proper address. *See i.e. Jones v.* UOP, 16 F.3d 141, 144 (7th Cir. 1994)(penalty refused because plaintiff addressed her requests to her employer's legal and personnel departments instead of the designated plan administrator:); *Malaney v. AT&T Umbrella Benefit Plan No. 1*, No. 2:10-cv-401, 2010 WL 5136206 at *7 (S.D. Ohio Dec. 9, 2010)(request for plan documents sent to claims administrator not sufficient to trigger liability); *Cole v. GM Retirement Program*, No. 05-73018, 2007 WL 470409 at *5 (E.D. Mich. Feb. 8, 2007)(requests not directed to proper address are not actionable); *Van Hoey v. Baxter International, Inc.*, No. 96 C 6231, 1997 WL 665855 at *7 (N.D. Ill. Oct. 21, 1997)(no penalty imposed because plaintiff directed her requests to her employer's legal department instead of to the designated plan administrator).

### Conclusion On Failure To Provide Documents

Although some of the requests were only for documents regarding retirement (pension), some were only for documents regarding post-retirement medical benefits and some were for both, the Court need not distinguish. The Rule 56 evidence shows that McCarthy did not send a written request to the Plan Administrator at the address indicated. Thus, there are no genuine issues of material fact and AT&T is entitled to summary judgment on McCarthy's Third Claim for Relief for failure to provide documents. Likewise, McCarthy's Motion for Partial Judgment

on this Claim is overruled.

In their Briefs, the Parties discuss penalties for failing to provide plan documents. However, the Court need not address penalties since McCarthy has not shown that the Plan Administrator failed to provide documents as is required by 29 U.S.C. §§ 1024 and 1025.

In her Second Amended Complaint, McCarthy seeks damages from AT&T and/or Ameritech. However, since AT&T is the Plan Administrator, McCarthy cannot obtain damages from Ameritech. Thus, McCarthy cannot sustain her Third Claim for Relief against Ameritech.

## FOURTH CLAIM:  ERISA - WRONGFUL DENIAL OF BENEFITS

In her Fourth Claim for Relief, McCarthy alleges that API wrongfully denied her post-retirement health and welfare benefits and she should recover the value of the health and welfare benefits that she should have received between August 15, 2008, and May 7, 2009, along with the reasonable attorneys' fees and costs associated with bringing this action. API responds that McCarthy did not apply for and thus was not denied benefits.

This is, based upon McCarthy's SAC, a claim for ERISA benefits. An ERISA denial-of-benefits claim is generally brought after a claim for benefits has been denied by a plan administrator. *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 983 (6th Cir. 1991). The court's role is to adjudicate the ERISA claim under the plan's provisions using the administrative record available to the plan administrator when the decision to deny benefits was made. *Id.* at 983-86. In this case, McCarthy did not make a claim for benefits to the plan administrator and has not submitted an administrative record upon which her claim could be considered.

McCarthy argues that she was entitled to receive retirement medical benefits as of August 15, 2008, and made multiple requests for those benefits. However, the multiple requests are not

claims for benefits to the plan administrator.

In an attempt to avoid a formal application process, McCarthy points out that this Court has already concluded that she was denied meaningful access to available review procedures contained within Plan documents and an exhaustion of administrative remedies is not required. (Doc. #64.) This statement was made in the context of whether McCarthy was barred by the futility requirement from amending her Complaint and was based upon allegations in her complaint and not on Rule 56 evidence. (Id.)

Rule 56 evidence has now been presented that shows that McCarthy admits that she was provided various Plan documents during her employment and was aware of how to obtain them on the Company website. She also received annual "Where To Go" guides. Thus, while McCarthy may have been denied meaningful access to available review procedures during the process of her lawsuit, the Rule 56 evidence indicates that she was aware of, or should have been aware of, the review procedures for her claim for post-retirement medical benefits at the time she was making decisions regarding retirement.

McCarthy did not make a formal claim for ERISA benefits and has not submitted an administrative record of the denial of any formal claim. Further, the Rule 56 evidence indicates that McCarthy knew or should have known the process for making a claim for post-retirement medical benefits. Therefore, McCarthy's ERISA claim for the wrongful denial of benefits must fail. There are no genuine issues of material fact and API is entitled to judgment as a matter of law on McCarthy's Fourth Claim for Relief for wrongful denial of benefits.

## FIFTH CLAIM: FRAUDULENT INDUCEMENT

In her Fifth Claim for Relief, McCarthy alleges that API fraudulently induced her to

deplete her severance payment and continue to work. API responds that McCarthy cannot establish all of the elements of a fraudulent inducement claim, the claim is preempted by federal law and the claim is not properly pled.

Under Ohio law, to prove fraudulent inducement, a plaintiff must establish "(1) a false representation concerning a fact or, in the face of a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *Micrel, Inc. v.. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007)(quoting *Lepera v. Fuson*, 613 N.E.2d 1060, 1063 (Ohio Ct. App. 1992)).

In this case, the alleged fraud was that API management provided her false information that she was not eligible for retirement medical benefits in August of 2008. Each of the elements of fraudulent inducement will be examined to determine if McCarthy can present evidence thereof.

### A False Representation

There is Rule 56 evidence that McCarthy could have received post-retirement medical benefits in August of 2008. There is also evidence that an API employee told McCarthy that she could not retire with full benefits in August of 2008. In addition, there is evidence that McCarthy was not eligible for retirement (pension) benefits in August of 2008, aside from an accrued benefit under the Midwest Publishing Ventures Program. Thus, although McCarthy could have received post-retirement medical benefits in August of 2008, she could not have retired and received full retirement benefits then, including both pension and post-retirement medical

benefits.

McCarthy testifies that she was told by API that she could not retire with benefits but she has not identified Rule 56 evidence that she was told by an API employee that she could not receive post-retirement medical benefits in August of 2008. She was told by an API employee that she was not eligible to retire in August of 2008 but there is no evidence that she was told only that she could not receive post-retirement medical benefits then. Therefore, McCarthy has not identified Rule 56 evidence of a false representation.

### Knowledge of the Falsity

There is evidence that an API employee told McCarthy that she was not eligible for full retirement benefits in August of 2008, which is supported by the Rule 56 evidence, but there is no evidence that an API employee specifically told McCarthy that she could not retire with post-retirement medical benefits in August of 2008. Thus, there is no falsity about which API can be deemed knowledgeable.

### Intent To Induce Reliance

Without a misrepresentation, there can be no intent to induce reliance. Further, there is no Rule 56 evidence that API made any representations for the purpose of inducing McCarthy to forego retirement in August of 2008 and enter into the EOA.

McCarthy signed the EOA on August 14, 2008. McCarthy's notes indicate that she was told by Zawisa that she "could not retire with benefits" on August 30, 2008. Even if it could be considered a misrepresentation, which it is not, Zawisa's statement was made after McCarthy elected to enter into the EOA.

### Justifiable Reliance

On September 6, 2012, McCarthy executed an Affidavit in which indicates that she would not have entered into the EOP and depleted her severance if she had been told that she was eligible to receive retirement medical benefits. However, this statement is self-serving and disingenuous at best since it was made in June of 2012, long after her deposition and the events that happened in this case; since she entered into the EOP before she was told by Zawisa that she could not retire with benefits, and since, if she would have retired in August of 2008, she would have suffered a twenty thousand dollar reduction in her retirement (pension) benefit. (Stone Dep. 13, Ex. 12.)

### Proximate Cause

McCarthy identifies injuries that she says are proximately caused by the alleged misrepresentation. But, since there was no misrepresentation, there can be no injury.

### Conclusion On Fraudulent Inducement

McCarthy's response to Defendants' Motion for Summary Judgment on this claim refers to a statement made by the Court in the context of deciding whether to permit her to file her SAC. However, now, at the summary judgment stage, McCarthy must identify evidence sufficient to establish the existence of the elements essential to her claim. This she has not done.

The Defendants argue that, even if McCarthy had presented evidence satisfying the elements of a fraudulent inducement claim, this claim would be preempted by ERISA. If a claim is in essence for the recovery of an ERISA plan benefit, it is preempted by ERISA. *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991). However, McCarthy is not attempting to recover a plan benefit with this claim so it is not preempted by ERISA.

The Defendants also argue that this claim is preempted because the Court would need to

interpret the CBA to adjudicate this claim. However, as is seen above, this is not the case.

Yet, McCarthy has not identified evidence that satisfies all of the elements of a fraudulent inducement claim. Therefore, there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on McCarthy's Fifth Claim for Relief for fraudulent inducement.

## SIXTH CLAIM:  FLSA VIOLATION

In her Sixth Claim for Relief, McCarthy alleges that API unlawfully failed to compensate her for her hours worked from August 15, 2008, to May 7, 2009, at a rate equal to or greater than the federal minimum wage. API responds that McCarthy was paid in excess of the federal minimum wage for all hours worked during this period.

During the time McCarthy was working pursuant to the EOA that she signed, she was paid 85% of her regular wage rate. Eighty-five percent of her regular wage rate was $16.40 per hour. The federal minimum wage rate at the time was $6.55 per hour.

McCarthy does not dispute these numbers. She, however, argues that the payments she received were part of a severance obligation and do not constitute the payment of wages under the FLSA. In essence, McCarthy argues that API failed to pay her any wages for the hours she worked from August 15, 2008 until May 7, 2009.

McCarthy voluntarily entered into the EOA. She, however argues that FLSA rights cannot be waived by a labor agreement citing *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 737 (1981). In *Barrentine*, the Supreme Court was addressing the right to bring an FLSA claim based upon not being compensated for time spent complying with the employer's safety requirements, and held that FLSA claims are not barred by the prior submission of grievances to

the contractual dispute-resolution process. *Id.* Here, the EOA is not a labor agreement as envisioned in *Ballentine*, nor is it a grievance. Thus, *Barrentine* is inapplicable.

McCarthy also argues that the payment of a severance obligation does not constitute the payment of wages under the FLSA. To support this argument, she cites the Fifth Circuit case of *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738 (5th Cir. 2010). In *Martin*, the Fifth Circuit was addressing whether severance pay could be a set off against potential damages, and determined that set offs, unless the money being set off can be considered wages that the employer prepaid to the employee, are not allowed. In *Martin*, the benefits paid to the employee were not wage payments, but were paid to the employee in return for a release of claims.

*Martin* is not applicable here. When McCarthy was surplused, she could choose to end her employment and take a termination payment or she could enter the Employment Opportunity Pool and draw wages at 85% of her regular work rate until she received an amount of wages equal to what her termination payment would have been. Although the FLSA does not mandate severance pay, API offered a severance obligation. However, McCarthy did not select this option. The option selected by McCarthy to enter the Employment Opportunity Pool was not a severance obligation. It was an obligation to allow McCarthy to continue working.

Finally, McCarthy argues that the EOA cannot be viewed as a waiver because she was fraudulently induced to enter into the EOA. However, there is no Rule 56 evidence that she was fraudulently induced into entering into the EOA.

From August 15, 2008, to May 7, 2009, McCarthy was compensated at a rate equal to or greater than the federal minimum wage and API's obligation to pay McCarthy was not waived by a labor agreement nor was it a set off to a severance obligation. Thus, McCarthy was paid in

excess of the federal minimum wage for all hours worked during this period. Therefore, there are no genuine issues of material fact and API is entitled to judgment as a matter of law on McCarthy's Sixth Claim for Relief for violation of the FLSA.

## SEVENTH CLAIM:  PROMISSORY ESTOPPEL

In her Seventh Claim for Relief, McCarthy alleges that she depleted her severance pay and continued to work until she turned 65 due to API's promise regarding her eligibility for retirement benefits. API responds that McCarthy cannot establish the requisite elements under ERISA and a state law claim for promissory estoppel is preempted.

Under Ohio law, the elements of a promissory estoppel claim are; (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise. *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp.2d 899, 915 (S.D. Ohio 2009)(citing *Sweitzer v. American Express Centurion Bank*, 554 F. Supp.2d 788, 796 (S.D. Ohio 2008)). Each will be addressed seriatim.

The promise in this case is alleged to be Cameron's statement to McCarthy that she was not entitled to retiree health benefits as of August 15, 2008. However, according to McCarthy, Cameron's statement was that she could not retire with benefits. (McCarthy Dep. 42-44; Zawisa Dep. 48-49.) Thus, Cameron did not make a clear, unambiguous promise that McCarthy was not entitled to retiree health benefits as of August 15, 2008. Cameron's statement is, at best, ambiguous. As was later determined, McCarthy was not eligible for full retirement benefits at the time but she was eligible for post-retirement medical benefits.

Without a clear, unambiguous promise, the analysis of a promissory estoppel claim cannot

proceed any further. McCarthy has not satisfied the first element.

The Defendants argue that this claim is preempted by ERISA. Where a plaintiff asserts a claim that does not seek to recover benefits due under the terms of an ERISA plan, to enforce rights under the terms of an ERISA plan or to clarify rights to future benefits under an ERISA plan, the claim is not preempted by ERISA. *Crase v. Shasta Beverages, Inc.*, No. 2:10-cv-00507, 2011 WL 94615 at *3-4 (S.D. Ohio Jan. 10, 2011). In this case, McCarthy is seeking damages relating to being forced to enter into the EOP. Thus, she is not making any sort of ERISA claim which may be preempted.

McCarthy has not identified a clear, unambiguous promise. Thus, there are no genuine issues of material fact and API is entitled to judgment as a matter of law on McCarthy's Seventh Claim for Relief for promissory estoppel.

## EIGHTH CLAIM:  UNJUST ENRICHMENT

In her Eighth Claim for Relief, McCarthy alleges that API was unjustly enriched because API should have provided her normal wages from August 15, 2008, until May 7, 2009, and did not. API responds that this claim fails as a matter of law, is preempted by federal labor law and McCarthy failed to exhaust the grievance procedure.

An unjust enrichment claim cannot be maintained where there is an express contract covering the same subject matter. *See Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir. 1996). In this case, there is an express contract covering the wages to be provided to McCarthy - the EOA. Therefore, McCarthy cannot maintain this unjust enrichment claim.

McCarthy argues that she worked full-time for API for nine months without being paid

any wage beyond the severance she was already owed. However, as provided in the EOA which she voluntarily entered into, the work was in lieu of being paid a severance.

McCarthy also argues that she entered into the EOA "under duress" and her entry into the EOA was triggered by a "blatant lie" regarding her eligibility for medical benefits. Whether or not she entered into the EOA "under duress" is a conclusory assertion supported only by McCarthy's own opinion. Also, McCarthy has not identified evidence that a clear, unambiguous promise was made by API regarding her eligibility for post-retirement medical benefits.

McCarthy also argues that API should be estopped from asserting any procedural defenses such as preemption or failure to exhaust the grievance procedure because API never appointed a group of State Opportunity Pool Administrators and a Corporate Opportunity Pool Administrator to implement and administer the Employment Opportunity Pool, including handling complaints. However, this argument is without merit because procedural defenses are not used to defeat this claim. Also, McCarthy has identified no evidence that she intended or even attempted to process a complaint regarding the Employment Opportunity Pool.

The Defendants argue that McCarthy's unjust enrichment claim is preempted by the federal Labor Management Relations Act because adjudicating this claim requires interpretation of the CBA. However, as seen above, adjudicating this claim does not require interpretation of the CBA.

McCarthy's unjust enrichment claims fails because there is an express contract, the EOA, governing this claim. Therefore, there are no genuine issues of material fact and API is entitled to judgment as matter of law on McCarthy's Eighth Claim for Relief for unjust enrichment.

## CONCLUSION ON SUMMARY JUDGMENT

There are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law on all of McCarthy's claims. Defendants' Motion for Summary Judgment (doc. # 70) is GRANTED and McCarthy's Motion for Partial Summary Judgment (doc. #67) is OVERRULED.

## MOTION TO STRIKE AND FOR SANCTIONS

API has filed a Motion To Strike and for Sanctions. (Doc. #88.) McCarthy has responded. (Doc. # 91.)

API seeks to strike McCarthy's Affidavit dated September 6, 2012. This Affidavit was filed in response to an Order (doc. #81) striking McCarthy's Affidavit dated June 7, 2012.

The Court has reviewed the Motion To Strike and finds that the Court did not use or refer to the specific paragraphs in McCarthy's September 6, 2012 Affidavit about which API complains. Further, the Court sees no good cause to strike the entire Affidavit. Therefore, API's Motion To Strike is moot. Also, the Court does not find good cause to sanction McCarthy for the filing of this Affidavit.

API's Motion To Strike and for Sanctions is overruled. The Motion To Strike is moot and good cause for sanctions has not been shown.

## FUTURE DATES

Because summary judgment has been granted, the Final Pretrial Conference and Trial of this matter are vacated. However, the continuation of the Court's hearing on McCarthy's application for Attorneys' fees remains scheduled to begin at 9:00 a.m. on December 5, 2012.

**DONE** and **ORDERED** in Dayton, Ohio this Twenty-Third Day of November, 2012.

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record